FILED

2009 Sep-30  AM 11:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RODERICK PAIR, JR.,              }
                                 }
      Petitioner,                }
                                 }        CIVIL ACTION NO.
v.                               }        08-AR-1541-S
                                 }
JOHN CUMMINS and THE ATTORNEY    }
GENERAL OF THE STATE OF          }
ALABAMA,                         }
                                 }
      Respondents.               }

**MEMORANDUM OPINION**

    This opinion responds to the report of the magistrate judge of July 9, 2009, and to his accompanying recommendation that the petition of Roderick Pair, Jr. ("Pair") for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 be "granted unless the state grants the petition for a new trial within 120 days of the finality of this court's ruling". In 2005, Pair was convicted in the Circuit Court of Jefferson County, Alabama, of sodomy in the first degree. Neither the magistrate judge nor this court finds any procedural shortcoming that would prevent the court from addressing the sole question raised by Pair, namely, his allegation that his trial counsel provided ineffective assistance in violation of his rights under the Sixth Amendment.

    The magistrate judge, who, in addition to reviewing the state court trial and appellate proceedings to the extent they were furnished to him, and evaluating affidavits submitted by Pair in state court post-conviction proceedings, himself conducted an

evidentiary hearing in which Pair's trial attorney testified.  The report and recommendation is a comprehensive and carefully written opinion by a magistrate judge who knows more about *habeas corpus* proceedings than this court will ever know.  At the conclusion of the report, the magistrate judge notified the parties as follows:

> Any party may file specific written objections to this report within fifteen (15) days of the date it is filed in the office of the Clerk.  Any objections filed must specifically identify the findings in the magistrate judge's recommendation to which the objections pertain.
>
> **★ ★ ★ ★ ★**
>
> Failure to file written objections to the proposed findings and recommendations of the magistrate judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifesting justice.

Respondents, John Cummins ("Cummins") and the Attorney General for the State of Alabama ("Attorney General") (collectively "respondents"), timely and specifically objected to the magistrate judge's conclusion that the representation provided to Pair by Hewitt Conwill ("Conwill") did not meet the standards enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), **in two respects.**

On the subject of "ineffective assistance", the Supreme Court in *Strickland* instructed the lower federal courts as follows:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of

2

reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.  At the same time, **the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.**

(**emphasis added**)

104 S. Ct. 2066.

Pair undertook to identify a number of Conwill's alleged acts or omissions that, according to Pair's *habeas corpus* counsel, cannot fairly be described as the product of reasonable professional judgment, and that prejudiced the outcome for Pair. Because Pair did not himself file any objections whatsoever to the magistrate judge's report and recommendation, this court is not called upon to undertake a *de novo* examination of the magistrate judge's findings and recommendations, insofar as they rejected Pair's criticisms of Conwill's performance other than the two with which the magistrate judge agreed.  In other words, there was no need for respondents in this court to defend against Pair's contentions to the extent they have been found unavailing by the magistrate judge as he applied *Strickland* analysis to them.  The magistrate judge found that all of Conwill's strategy decisions and actions complained of by Pair, except two, were either exercises of reasonable professional judgment and therefore did not constitute

3

"ineffective assistance", or that they did not adversely affect the outcome.   Only two of his findings led the magistrate judge to recommend to this court that a new trial for Pair be ordered. Because respondents properly objected to both of the magistrate judge's potentially dispositive recommendations, the court is obligated to examine respondents' two objections *de novo*.

Although the court has read the entire record, it does not substitute its judgment for the judgment of the magistrate judge, much less of the state trial judge or of the state appellate courts, **except to the extent necessary to give *de novo* consideration to the findings and recommendations to which respondents have specifically objected.** Although no presumption of correctness attaches to the magistrate judge's findings (unlike the *Strickland* presumption in favor of trial counsel), the reviewing court will endeavor to write an opinion that matches the careful and thorough examination the magistrate judge gave the issues before him.   In this case, that obligation will result in an opinion that is considerably longer, and that took longer to write, than this court's usual opinions, largely because critical portions of the trial testimony and of Conwill's testimony in explanation of his trial performance will be set forth *in haec verba*.

Not only does *Strickland* require that significantly poor performance by trial counsel be proven by the petitioner in order for *habeas* relief to be granted, but that actual prejudice be

demonstrated, i.e., a causal connection between the deficient performance and the adverse outcome.  The Supreme Court used the following language to describe a petitioner's causation burden:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

104 S.Ct. 2068.

It is difficult to judge the performance of a trial lawyer from a cold trial record, especially without having his opening statement and his closing argument.  What occurs in between the opening and the closing is, of course, crucially important, but it needs to be examined in context.  Because neither the magistrate judge nor this judge had before him Conwill's closing argument (the providing of which was Pair's responsibility), the court gives Conwill the benefit of the doubt and assumes that in his closing argument he adequately exploited the building blocks for innocence that are scattered throughout the evidence, but that, as it turned out, failed to convince this particular jury that the state did not meet its burden of proving Pair's guilt beyond a reasonable doubt. There is no suggestion by Pair that Conwill's closing argument was inadequate, much less constitutionally deficient.  It is clear to this court that upon the evidence the jury had before it, a verdict of guilty was not a foregone conclusion.  On the evidence, a reasonable jury could just as readily have acquitted Pair as it

convicted him.  If a trial lawyer's performance is to be judged by whether he wins or loses, trial lawyers will become like physicians who over-examine, or over-prescribe, or get a job with the Social Security Administration.   This is a loose translation of *Strickland*.  The question here boils down to whether or not Conwill did a professionally acceptable job.   According to *Strickland*, Conwill is strongly presumed to have rendered adequate assistance and that he made all of his significant decisions in an exercise of reasonable professional judgment.   This court proceeds with this presumption firmly in mind.

### The Evidence Pertinent to the
### Two Matters for *De Novo* Review

It is undisputed that Pair and A.A., the alleged sodomy victim, had a significant sexual relationship prior to the event made the subject of Pair's indictment and prosecution for sodomy. Whether that relationship was more important to A.A. or to Pair is not a question that could be put to the jury by special interrogatory, and therefore has not been answered, unless inferentially.  It nevertheless is a relevant question.  It could have been answered either way on the evidence hereinafter discussed, just as the ultimate question of guilt or innocence could have been answered either way.

The only witness at the evidentiary hearing held by the magistrate judge was Conwill himself, now a circuit judge in Shelby County, Alabama.  It was Conwill who defended Pair in 2005.  Shelby

6

County adjoins Jefferson County, and there is nothing unusual about an experienced Shelby County lawyer appearing in a Jefferson County court.   There is nothing in the magistrate judge's report and recommendation to suggest that he doubted Conwill's general competence, sincerity, and credibility.   In other words, the magistrate judge readily assumed Conwill's veracity.  He questioned Conwill's judgment **only in two material respects**.  Thus, neither the Eleventh Circuit's holding in *Proffitt v. Wainwright*, 685 F.2d 1227 (11th Cir. 1982), nor its holding in *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230 (11th Cir. 2007), has any applicability.  To the extent this court possesses discretion about whether or not to conduct its own evidentiary hearing as a part of a *de novo* review of the only two issues before it, the court elects to limit its review to what is in the record.

A.A. testified at Pair's criminal trial that Pair suddenly appeared at her apartment door, while she was talking to him on his cell phone.  According to A.A., she invited him in, whereupon he attacked her, forcibly raping and sodomizing her.  Because the parties had known each other intimately for a period of time, Conwill obviously could not and did not mount a misidentification defense.  Pair testified in his own defense, admitting to an earlier credit card fraud conviction, but categorically denying that he had done to A.A. what she accused him of doing.  One witness, corroborated by another, upon her oath, testified that

7

Pair could not have been with A.A. at the time of the alleged attack because he was with her.  Conwill's questions to A.A. were designed to suggest, and to lay the ground work for a closing argument that she had deliberately injured herself and accused Pair of sodomy in retaliation for Pair's termination of their relationship.  Pair readily admitted his previous sexual relationship with A.A.  Not only did A.A. not deny that relationship, but admitted a number of previous sexual liaisons with Pair.  Pair testified that after a period of time it was **he** who disassociated himself from A.A., ending the relationship well before the incident complained of.  He testified that A.A. continued to implore him to resume the relationship, even phoning him from Greece while she was vacationing there.  He testified that after he stopped seeing A.A., she aggressively sought a renewal of the relationship.  Pair further testified that he strenuously rebuffed A.A.'s requests for reconciliation and told her to quit calling him because he had a new girlfriend.  A.A. testified that **she could not remember whether or not Pair told her not to call him anymore.**

Conwill testified before the magistrate judge, *inter alia*, as follows:

Q    You were an attorney prior to becoming a judge; is that correct?

A    Correct.

Q    How many years did you practice law?

8

A      37.

Q      37 years.   What was your primary field of
       practice?

A      General practice.

Q      Did you handle criminal cases?

A      Yes.

* * *

Q      And you represented Roderick Pair in this case
       did you not?

A      Yes.

Q      He was charged with sodomy?

A      Correct.

Q      And from the beginning Roderick always denied
       the allegations in this case; is that correct?

A      Absolutely.

Q      He told you that he did not do this and he had
       nothing to do with this woman and the
       allegations correct?

A      Well he had nothing to do with the woman's
       allegations.   He had previous relations.

Q      Through your investigation you found out that
       there was no physical evidence to back up the
       victim's statement in this case such as semen,
       DNA or anything such as that?

A      Such as that, no.

Q      There was evidence that she had had something
       sodomize her.   Is that correct?

A      She had injuries.

* * *

9

Q    There were four possibilities that could have
     happened in this case, four possibilities,
     scenarios of how this happened.   No. 1,
     Roderick did it.   That's one possibility;
     correct?

A    Yes.

Q    But he denied that.   So that wasn't a
     possibility.   That wasn't a part of your
     defense strategy, trying to work out a plea
     bargain or anything like this?

A    No.

Q    The second one, was it possible there could
     have been misidentification, but that wasn't a
     possibility in this case because they had
     known each other and had dated each other.  So
     misidentification was not a possibility was
     it?

A    It might have been a possibility but mighty
     slim.

Q    Wasn't that one of the strategies you pursued
     in this case?

A    No.

Q    Never considered that as a strategy?

A    No.

Q    That would leave two other possibilities in
     this case.   Let me see if you agree with me.
     Number one, that she did it herself to herself
     and was blaming Roderick or No. 2 somebody
     else did it and she was blaming Roderick?

A    Correct.

Q    Those are the only two possibilities if
     Roderick was innocent; is that correct?

A    There might be some strange others but that
     would be the two main ones.

10

Q     Would it be fair to say that that would be strategically your defense?

A     What.

Q     To try and prove that she did it to herself or somebody else did it to her and she was blaming Roderick for it now?

A     Yes.

                          *  *  *

Q     And you did present an alibi defense in this case did you not?

A     Yes.

Q     **And you had in your opinion good alibi witnesses did you not**?

A     **Tremendous alibi witnesses.**

Q     **And explain to the court why you believe that they were tremendous alibi witnesses**?

A     **Well the primary one was I believe her last name was Dunn.  She was former girlfriend of Roderick.  She was smart, she made a great appearance.  By that I mean a great normal appearance.  She had a testimony that really couldn't be shaken as far as me talking with her or she just made what you would call a great witness.  She made a great witness on the witness stand.**

Q     **So in your 36 years of practice as a general practitioner in doing criminal law, in your opinion she made a very good alibi witness; correct**?

A     **Yes.**

Q     **And you had a very good alibi defense in this case correct**?

A     **Yes.**

                            11

Q     But you also are aware that you would have to convince – the victim in this case didn't appear to be if you looked at her or talked to her or saw her on the witness stand **she didn't appear to be having a mental disease or defect or "crazy" did she**?

A     **From her appearance**?

Q     **Right.**

A     **No.**

Q     **And from her demeanor**?

A     **Just from demeanor alone, no.   I think her answers did.**

Q     **But you were aware – prior to trial very early on in this case that you were aware that you were going to have to convince the jury that the victim had some kind of mental condition that would cause her to fabricate these allegations, didn't you**?

A     **No, I don't know if I had to convince some kind of mental condition, but I think I was going to have to prove that she did it to herself.   Out of either rage or jealousy or whatever.**

*  *  *

Q     And you had in your possession two postcards that were sent from Greece by the victim in this case to Roderick after the breakup, whoever has broken it up and before the sodomy isn't that correct?

A     He received them before the sodomy.

*  *  *

Q     And these were postcards sent from Greece to the defendant or petitioner after the breakup, whoever had broken up and before the alleged sodomy; correct?

12

A    Yes, I'm sure it with was.

Q    And they were in your possession.  They were
     in your possession prior to trial correct?

A    Yes, but although one day is 7/8/03.  Date.
     [**This doesn't make sense.**]  Is that what you
     said?  Okay.

                         * * *

Q    These would have been demonstrative – this
     petitioner's two and three are demonstrative
     evidence to prove what Roderick Pair had
     testified about the breakup of the
     relationship, correct?

A    Yes.

Q    **And there's no strategic reason not to
     introduce those postcards was there**?

A    **When I first talked to you I thought there
     was, but looking at them I don't see one.**

Q    **Would it be fair to say you maybe just forgot
     them**?

A    **No, I don't think I forgot them.**  I think
     Daria, his mother, had given an affidavit that
     she asked me about that later when she either
     picked them up and said at the time I couldn't
     find them or something.  So if I told her
     that, that's what it was.

Q    But it wasn't a strategic decision not to --

A    It was not a strategic point.

Q    It would have been clearly would have been
     beneficial to the defendant in this case to
     have had those records before the jury?

A    **Well, it would have aided his testimony about
     them.**

Q    **And cast doubt on her testimony wouldn't it**?

                          13

Q      **On her credibility**?

A      **His testimony had done that, but this would have been something they could have looked at, I agree with you.**

Q      This woman was not a small petite woman was she?

A      No, she wasn't small and petite.

A      Small and big.

Q      She was big?

Q      And Roderick is not a muscular, oversized guy is he?

A      There he is.  I mean he –

Q      The record can't.  **He is an average size male**?

A      **Correct.**

Q      **And she was an over – larger than average size female correct**?

A      She was short and fat.

       THE COURT: Can we be a little more specific here as opposed to those types of terms? Height and weight.

Q      **How tall and how much did she weigh**?

A      **I would say five three or four and it's hard to say.  She wasn't obese but she was I would say 150, maybe.**

Q      **Could she have weighed up to 180**?

A      **Well 150. She could have.  I just don't** –

Q      **And Roderick is – 6'2", 185 pounds**?

A      **Correct.**

14

Q       There was no evidence in this case that any
        lubricants or anything was used was there?  No
        testimony?

A       Not that I remember.

Q       And basically you have the testimony that this
        woman said that she was held down and without
        the use of any lubricants or anything he was
        able to anally sodomize her?  I guess that's
        redundant.  He was able to sodomize her with
        his penis?

A       That was her testimony at trial.  **That had not
        been her written testimony to the police
        officers.  What they had taken down.  She said
        they started to embrace tearing each other's
        clothes off but at trial she changed that to
        it was that he had forcibly done this.**

Q       And her testimony to the police and her
        testimony at trial, whatever she said before,
        both times she said she was sodomized?

A       Correct.   One time they were passionately
        loving each other and he all of a sudden tried
        to do and section [**This doesn't make sense.**]
        and she said stop or something and then her
        other testimony was that he just forced her
        the whole time.

                            * * *

Q       And you were not allowed to present any other
        defense except alibi in this case, were you
        not?

A       Well, no, **we did get into some of the
        contradictions of her statement, which were
        totally unbelievable – she changed her story
        or then on cross-examination changed things, I
        don't know, well maybe, I don't remember.
        That was evidence, too.**

Q       But the only defense, actual defense, that you
        put on to counter these things besides the

                              15

cross-examination of the witness was alibi witnesses; correct?

A   Well, his testimony.

Q   That he didn't do it?

A   Cross-examined all of the people there but obviously alibi, yes.  I mean, if that's what you are asking, his primary defense was that he didn't do it and that her story was somewhat absurd, really, and that he had at least two very credible alibi witnesses.

Q   **But there still was no explanation given to the jury as to why someone who was seemingly normal would make up these allegations was there**?

Q   **There was no testimony to counter**?

A   **Well that testimony was pretty well stricken by the judge.**

Q   Going back to Mr. Gott's [Gaut's] affidavit, you don't disagree with his conclusion that or his observation that it was unusual to see a case where an average size male was able to anally penetrate an average size female by holding her down?

A   I'm sorry.  What was the question about that.

Q   He writes in his affidavit he says I cannot remember any case similar to the facts that were alleged by the victim in this case where an average size male was able to anally penetrate an average size female by simply holding her down without any restraint or help by a third party?

A   Yes he said that.

Q   And you don't disagree with that opinion?

A   I have no idea.

16

Q    You didn't do any research or any
     investigation into that did you?

A    **Well I did the investigation I did, but I
     didn't go into investigation of how many times
     or if there has ever been a case of holding
     someone down and having anal sex against their
     will.**

Q    So would it be fair to say you didn't consult
     any experts in the area of sodomy or rape?

A    No I did not.

Q    It wasn't trial strategy not to use somebody
     such as Dr. Ford was there?  It wasn't trial
     strategy not to use Dr. Ford?

A    Well, I just used other trial strategy.  I
     didn't particularly say I'm not going to –
     that wasn't some thought that went into my
     head.  It's just obviously I had used another
     trial strategy.

Q    But you didn't have a trial strategy that said
     I am not going to use an expert such as Dr.
     Ford or psychologist or psychiatrist?  You
     didn't have a trial strategy not to do that
     correct?

A    Well, the fact that I didn't do it meant I
     didn't have a trial strategy to do that.

Q    Well it's possible to have trial strategies
     that you determine are not beneficial to the
     case correct?

A    Well, yes.

Q    And you didn't come to the conclusion that
     that trial strategy would not be beneficial to
     this case; correct?

A    Well, my trial strategy was that a jury of 12
     folks and when the information is there about
     her acts and herself and what she as doing,
     you can hire experts and they will say
     whatever you want them to say and think a lot

17

of times juries look at it that way but it
certainly was not my trial strategy to – my
trial strategy was totally different.

(**emphasis added**).

At the trial itself, the prosecutor called A.A. as her first

witness. A.A. testified, *inter alia*, as follows:

Q   Amy, after that night, and this spring of
    2003, did you hear from the defendant after
    that?

A   Yes.

Q   Okay. Please tell us about how y'all came in
    contact with each other again after that
    night.

A   I believe we had dinner at a restaurant off
    280.

Q   Was it a date, Amy?

A   Yes, it was a date.

Q   Do you remember when that was? I know you
    said that you met sometime maybe in May. How
    close in time had it been to the evening that
    y'all met?

A   It would have been probably within a week or
    so. It's hard for me to remember that. It
    was very brief.

Q   Amy, how long a period of time did you date
    the defendant?

A   It wasn't but just maybe a month or so.

Q   At some point in time – well, let me ask you
    this first. Describe for us the nature of the
    dating relationship, if you will. What did
    y'all do? What did y'all do on dates?

A   Well, we had dinner that one time. **I believe
    he did come to my home. Yes, we had had a**

18

**sexual experience.  It was not violent.  I'm not proud of it.  My father had died in April and, you know, emotionally I probably wasn't feeling very well at that time.**

Q    Amy, at some point **you chose to end the relationship with the defendant**; is that a fair statement?

A    **Yes.**

Q    All right.  Amy, if you will, **tell us how you ended that.**  Did you have a conversation with the defendant or what did you do?

A    No.  **It kind of just drifted off.**  You know, you don't call each other, you don't talk to each other.  It was never a formal, hey, you know, we're not seeing each other anymore.  **It just went away.**

Q    **It was a conscious decision on your part not to see him anymore**?

A    **Yes.**

Q    Amy, again, tell us about how many weeks after y'all first met that you decided not to see the defendant anymore.

A    Our time as dating was very brief.  I guess maybe six weeks into it, maybe.  You know, I decided he wasn't the person that I needed to be seeing.

Q    Now, you said things just kind of drifted off.  Did the defendant make phone calls to you that you didn't return?

A    Yes, I'm sure.

Q    Now, in your mind, Amy, **would you characterize the ending of this relationship as amiable**?

A    **Yes.**

Q    Was it in any way an angry break-up?

A     Not at all.

Q     Ugly break-up?

A     Not at all.

Q     At the time that you decided that the
      defendant was not right for you, and that you
      wanted to end it –

      MR. CONWILL:     Judge, we object to leading.

      THE COURT:       Overruled.

Q     At that point, that you decided to end it, did
      you have any ill feelings –

A     No.

Q     – towards the defendant?

A     I did not, because **I knew that I did not need
      to be with this person.**

Q     **Did you wish him any harm**?

A     **No.**

Q     **Or any ill will at all**?

A     **No, not at all.**

Q     **Did you just want it to be over with**?

A     **Just simply wanted it to be over.**

Q     All right.  **Amy, did you travel anywhere in
      those weeks after you quit returning the
      defendant's phone calls**?

A     Yes.

Q     Where did you go?

A     I went to Greece.

Q     How long were you there?

A     About two and a half weeks.

Q     Now, sorry to backtrack for a moment, but I
      knew you told us now that you're living in
      Vestavia?

A     Yes.

Q     **Where were you living at the time that you
      were dating the defendant**?

A     **In Gardendale, Alabama.**

Q     **The whole time that you were dating him**?

A     **Yes.**

Q     Amy, **after you got back from Greece, did you
      move to a new home**?

A     **I did.**

Q     Tell us, is that in the same home where
      you are now?

A     Unfortunately, yes, it is, because I was in a
      lease –

Q     Okay.

A     – and I've had to live there.

Q     A lease that you couldn't get out of?

A     Right.

Q     Is that home there at the Vestavia Villa
      Court?

A     Yes.

Q     Now, I want you to go back in your mind to
      that night of August the 14th at about 11:45
      or so at night.   Did you have a phone
      conversation with the defendant?

A     Yes, I did.

Q     Okay.  **Amy, who called who, if you remember**?

A     **I contacted him.**

Q     Tell us why you called him.

A     The reason I called him is because one of my best friends was saying that he knew someone he wanted to fix me up with on a date.

Q     Who was this friend?

A     Johnny Hayes.

Q     All right.

A     I found it very odd because Johnny was a good bit older.  He's in his fifties.  He's a banker.  Roderick obviously wasn't in that line of work and he was much younger.

Q     Let me stop you for just a moment, Amy, Johnny Hayes, was he your friend, or did you know him through a friend?

A     I knew him through my friend that was dating him.

Q     When you referred earlier to a friend, who were you speaking of?

A     I'm referring to Carolyn Case.  Carolyn Case was dating Johnny Hayes.

Q     Okay.  Continue and tell us more about this Johnny Hayes conversation.

A     I contacted him [Pair].  I said, "Something very bizarre.  Johnny Hayes has suggested that you and I date.  He says that you guys have gambled together and that you owe him money."  Roderick says, "Well, no, he owes me money but we still talk."  He even said, "Well, you know, just last weekend I was at Bahama Breeze and had dinner with him and his girlfriend."  I said, "Well, that's very strange because his girlfriend was with me out of town."

22

**MR. CONWILL:   Is she talking about the conversation with Mr. Pair?   Is that who you're talking to**?

A   **This was the phone call that was initiated on that night.**

Q   Okay.  Now, you just said that in that phone conversation – let me make sure that I understand – that the defendant, Roderick Pair, had said to you that he was with Johnny Hayes and his girlfriend –

A   The weekend before.

Q   Okay.  The weekend before?

A   Yes.

Q   And you knew that to be untrue because why?

A   Because Carolyn was with me out of town.

Q   All right.  Where were y'all?

A   We were in New Orleans.

Q   **So, after the conversation about the weekend that you knew couldn't be true, what else happened, or what else was talked about there in that conversation**?

A   **The doorbell rang.**

Q   **While you were still on the phone with the defendant**?

A   **Yes.**

Q   **What did you do**?

A   **I opened the door.**

Q   **Who was standing there**?

A   **Roderick – Rod was standing there.**

23

Q    Now, Amy, you've told us that you had moved
     since you had quit seeing the defendant?

A    Right.

Q    Had you ever told him –

A    No.

Q    – where you lived?

A    No.  In my mind, after all of this happened, I
     got –

     MR. CONWILL:   Judge, we would object to what
     was in her mind.

     THE COURT:     Sustained.

A    I felt as if Johnny Hayes –

     THE COURT:     Wait one second, ma'am.  When
     you hear someone say "objection," wait until
     you hear what I'm going to do.

     WITNESS:  I'm sorry.

     THE COURT:     Don't answer that question.
     Ms. Gwathney is going to ask you another
     question.

Q    So, as far as you knew, he didn't know where
     you lived?

A    That is correct.

Q    Okay.  Is there any way that the defendant
     could have learned where you lived?

A    I felt like that Johnny Hayes had probably
     told him.

Q    Now, when you opened the door, did the
     defendant come into your home?

A    Yes.

Q     Describe for us, if you will, what your
      apartment – or is it an apartment?  Is it a
      townhome?  Tell the jurors what it is.

A     It's a townhome and –

Q     Is it a two-story townhome?

A     It's a two-story townhome.

Q     There at the front door, does it open into a
      living room?  Is there a foyer?  What's the
      situation there?

A     A foyer.

Q     Now, when the defendant came into the foyer,
      tell us what happened there.

A     He came into the foyer, and my stairs are
      right here to the right (indicated).   My
      kitchen entrance is right here to the left
      (indicated).

Q     How much distance are we talking about, Amy,
      between your font door and the stairs that
      you're implying?

A     Maybe three feet.

Q     All right.   Did y'all remain there in the
      foyer of your home, or did y'all to somewhere
      else?

A     **No.  We walked through the home.  It was a new
      home.  I was proud of it.  Much bigger that
      what I had been living in.  When you go up the
      stairs, there immediately is the doorway to my
      bedroom.**

Q     **Did you show the defendant your bedroom**?

A     Yes, but we never got further than the
      entrance way.

Q     **Now, Amy, at that point that y'all got to your
      bedroom, were you afraid of the defendant**?

A      **No.**

Q      **Did you have any notion in your mind that you should be afraid of the defendant**?

A      **No, I did not.**

Q      **What happened when y'all got there in the bedroom?   If you'll just tell us the first thing that happened.**

A      **As we walked to the entrance of the bedroom, you know, I'm sure that there was a hug and a kiss, he's a very smooth person.   Very smooth.   Before I knew it, I was pinned down to the ground.**

Q      Do you remember how you ended up on the ground?

A      Pushed.   He was behind me.

Q      Okay.   So, he was standing behind you.   His face almost, for example how I'm behind Mr. Conwill, in that type situation?

A      Yes.

Q      He pushed you to the ground.   Amy, I need for you to tell us the details of what happened after he pushed you to the ground.

A      He ripped my panties down, as his pants were down around his feet, and he began holding my arms down and ramming himself into my anus.

Q      Amy, **when you say he rammed himself into your anus, do you remember if it was one time or if it was more than once**?

A      **No, it was repeatedly and with great force.**

Q      All right.   Amy, was it painful?

A      Yes.

Q     Had  you  consented,  up  to  that  point,  to
      anything  with  the  defendant,  other  than  the
      hug and kiss that you told us about?

A     No.  We had never had that kind of situation
      either, that kind of sex.

Q     Okay.  I know, Amy, it's hard to talk about
      these things.  To clarify, are you saying that
      you had never had anal sex –

A     That is correct.

Q     – with Roderick Pair?

A     That is correct.  Nor with anyone my entire
      life.

Q     You have already told the jurors that you and
      the defendant had had a sexual relationship in
      the past?

A     Yes.

Q     And, at any point had it ever been hurtful?

A     No.

Q     So, this was the first time that he ever hurt
      you?

A     Yes.

Q     How did you react?  Were you shocked?

A     I was in so much pain I couldn't move.  He had
      me completely held down.  I couldn't move and
      I was begging him to stop.

Q     Okay.  Amy, you said that he was ramming into
      you.  You specifically mentioned into your
      anus.  **Do you remember if he rammed his penis
      into you anywhere other than your anus**?

A     **I can't recall.**  It all happened so fast.  The
      whole time he was doing this I'm like, why are
      you doing this?  Please stop.

Q      **Amy, you asked him why.  Did he say anything
       to you while he was doing this**?

A      Yes.  **He said that he had given me a chance.
       That he had always dated prettier girls with
       prettier bodies.  That I didn't even have a
       good body, and that I hurt him, and he was
       going to hurt me the way I hurt him.**

Q      Amy, did he say anything else to you about –

       MR. CONWILL:    Judge, we would, again, object
       to leading.

       THE COURT:    Don't lead.

       MS. GWATHNEY:  Thank you.

Q      Amy, what, if anything else, did the defendant
       say to you?

A      He said that you can't make me come.  Nobody
       can.

Q      **Amy, did the defendant ejaculate that night to
       your knowledge**?

A      **No, not to my knowledge.**

Q      **The previous sexual relationships that y'all
       had had, did the defendant ever ejaculate**?

A      **No.**

Q      **Was that something that you were conscious of**?
       **That you had noticed in those encounters**?

A      **Yes.**

Q      **Had y'all ever had a conversation about that**?

A      **No.**

Q      You asked him why.  What happened?

A      **I asked him why, why are you hurting me.  And
       he   just   continually   said   that   I   was**

28

**unattractive.   That my body was unattractive.
He had given me a chance and the he intended
to hurt me the way I had hurt him.**

Q      Now, at any point did he hurt you anyway other
       than sexually?

A      At that time?

Q      You talked to us about how he was ramming his
       penis into you.   Did, at any point, did he
       hurt you with any other parts of his body?

A      After he said "you can't make me come," he
       jumped up, pulled his pants up.   And I said,
       "Why have you done this to me?"   He hit me
       square right here (indicated).   I don't know
       if it was open handed, closed handed.   The
       next thing I know I wake up in my floor with
       blood all over my carpet and all over my
       underwear.

Q      Amy, you said earlier that he ripped your
       clothes off.   When you woke up there on the
       floor, describe for us what you had on.

A      I had on just a T-shirt.

Q      Okay.  Did you have on any underwear?

A      No.   I immediately got up, put my underwear
       on, I ran downstairs and my front door was
       wide open.

Q      What did you do?

A      I went back upstairs.   I noticed there was
       blood all over my underwear.   I throw them in
       the sink and I try to clean up the blood.   And
       then, it hits me, dear God, I've been hurt.

Q      Amy let me ask you something else.   Was there
       blood anywhere other than your underwear?

A      Just on the carpet.

Q      The carpet in the bedroom or somewhere else?

A     In the bedroom.

Q     So, Amy, you tried to clean up your underwear.
      **Did you try to clean up the blood on the
      floor**?

A     **I did.**

Q     Amy, if you can, tell us what was going
      through your mind at the time that you were
      trying to clean up.

      MR. CONWILL:    Judge, we would object.

      THE COURT:      Sustained.

Q     **Amy, at some point did you stop washing your
      underwear**?

A     **Yes, because at first I was like, what, what
      did I do**?

      MR. CONWILL:    Judge, again, we would –

      THE COURT:      Sustained.

Q     Okay.   Amy, after you had washed your
      underwear, and you had shut that front door,
      did you make any phone calls?

A     I did.

Q     Okay.  Who did you call first?

A     I called my friend Carolyn Case.

Q     This I the same Carolyn that you had spoke to
      us about earlier?

A     Yes.  And, I said –

      MR. CONWILL:    Judge, we would object to hearsay.

      THE COURT:      Sustained as to what was said.

Q     Amy, we're not going to talk about what you
      said to Carolyn, but you called her?

A       I called her.

Q       All right.  **Now, did you call anybody else
        after you called Carolyn**?

A       **I did.  I called Roderick.**

Q       Okay.  Amy, tell us why you called him.

        MR. CONWILL:    Again, Judge, we would object
        to her not communicating –

        THE COURT:      Overruled.

Q       **Amy, tell us why you called.**

A       **Because I wanted to know why he had hurt me,
        and why would he hurt me to that point and
        leave me knocked out with my front door wide
        open.**

Q       Amy, **this was somebody you had cared about** –

A       **Yes.**

Q       – **up until that night**?   **Is that a fair
        statement**?

A       **Yeah.**

Q       Somebody who up to that point had never hurt
        you?

A       No.

Q       Did you understand why he had hurt you like
        that that night?

A       No.

Q       Did you want to know why?

A       Yes.

Q       Okay.  Now, what did the defendant say to you
        on the phone when you called him that night?

A    He didn't answer why he had done what he did,
     but he said that he had called the police and
     I didn't really understand that.

Q    What did he say to you about him calling the
     police?

A    I don't really recall.  I just know that he
     said that he had called the police, and at
     that point I hung up and called 911.

Q    So, your next phone call, was it your last
     phone call of the evening?

A    Yes.

Q    You called 911?

A    Yes.

Q    You were placed through to the Vestavia Police
     Department?

A    Yes.

Q    Did you tell them what had happened at the
     time?

A    I did.

Q    Did a police officer respond –

A    Yes.

Q    – to your home?  Probably, actually, more than
     one responded, but did one show up by himself
     initially?

A    Yes.

Q    And, do you remember that officer's name was Scott
     Sivley?

A    (Nods head affirmatively.)

Q    Amy, later in the evening do you remember if
     Sergeant John Granger and Mike O'Connor came
     to your home?

A     Yes.

Q     Now, when they got there, when officer Sivley
      got there, Amy, were you still bleeding?

A     Yes.

Q     Amy, were you in pain?

A     Yes.

Q     If you can, describe for the jury the kind of
      pain that you were in.

A     My whole bottom was killing me and I was
      bleeding horribly.

Q     Now, Amy, when the officer got there, were you
      thinking clearly?

A     No.

      MR. CONWILL:    Judge, again, leading. Move to
      exclude.

      THE COURT:    I will sustain as to leading.
      You can rephrase your question.

Q     What was your state of mind when the officer
      arrived that night?

A     Dazed.  Pain.   Hard to believe that I had
      actually been hurt this way.

Q     Okay.  Amy, an officer filled out a police
      report that night.  Do you remember signing a
      police report?

A     I barely remember signing anything.

Q     Okay.  **Do you remember if the officer took a
      report**?

A     **Yeah**.  I knew they asked questions.

Q     Now, Amy, who seemed in control at that point
      while the questions were being asked?

A       The police officer.

Q       Okay.  Now, **did you at any point tell the officer that there had been some chitchat between you and the defendant**?

A       **Probably.**

Q       Are those your words?

A       Probably, yes.

Q       And, Amy, **there is a portion of the police report that states that they began ripping each other's clothes off.  Did you tell Officer Sivley that**?

A       **I probably said my clothes had got ripped off, yes.**

Q       Now, Amy, I want to make sure that I understand.  When you told the officer that, were you trying to convey that this was a consensual –

        MR. CONWILL:    Judge, again, we would object to leading.

        THE COURT:      Overruled.  I'll let her ask this.

Q       Were you trying to convey to the officer that there had been consensual ripping of each other's clothes off, or were you conveying that the defendant had –

        MR. CONWILL:    Judge, again, we would object to leading.

        THE COURT:      I'll sustain to that.  Rephrase your question.

Q       What did you tell the officer about the clothes that night, Amy?

A       All I can say is I was in so much pain I just wanted help.

34

Q    At that point, Amy, had you received any medical treatment?

A    No.  And, it wasn't until Sergeant Granger got there – he was, like, you've been hurt.  We need to get you help.

Q    So, Amy, when you – and **the police report talks about how this began a consensual, sexual relationship, is that a true statement in that police report**?

A    **It could be.  I don't – it happened so fast, you know?  I mean, the force, the strength.**

Q    Okay.

A    **I mean, it just happened.  An then, there's this police officer that just (snapped fingers).**

    MR. CONWILL:  Judge, we would object to unresponsive.

    THE COURT:  Let's ask another question.

Q    Amy, the night of August the 14th when Officer Sivley was there, did you have any intentions to mislead anybody?

A    No.

Q    Did you simply want to tell the truth?

A    Yes.

Q    Now, Amy, when Sergeant Granger and Detective O'Connor arrived, did they help you get some medical treatment?

A    Yes.

Q    Which one of them did that?

A    O'Connor.  He drove me.

Q    Where did he drive you?

A     to the Rape Crisis Center.

Q     When you got there, will you describe for us
      what happened?  Was there an examination?

A     Yes.

Q     All right.  Was there a nurse there that
      performed that examination?

A     Yes.

Q     Amy, describe for these folks the first thing
      that happened when you got there to the SANE
      Clinic.  I want you to be able to paint a
      picture for them of what happened.

A     They took me in a room.  I had to take all of
      my clothes off.  They began swabbing me,
      cutting pubic hair and trying to examine me,
      which was excruciating and painful.

Q     Amy, did the nurse that was doing the exam,
      did she ask you what had happened to you?

A     Yes.

Q     Did you tell her about what had happened
      earlier that night?

A     I did, yes.

Q     You said that they took some swabs and cutting
      of your pubic hair.  Is there anything else
      that you remember about the exam that night?

A     I know that I was shaking and crying so bad
      they put a quilt on me.  They couldn't even
      draw blood because I was shaking so bad.  They
      tried to assure me that what I did –

      MR. CONWILL:   Judge, I object to hearsay.

      THE COURT:     Okay.   Let her ask the next
      question.

Q     Amy, where did you go when that exam was over with?

36

A      I went home and the police patrolled the rest
       of the night.

Q      Amy, how long did it take you to recover from
       the  injuries  that  you  sustained  from  the
       defendant sodomizing you that night?

A      It was weeks.

Q      And, in the course of those weeks, did you go
       see other doctors?

A      I did.

Q      Did you go to your regular physician?

A      Yes.  Well, I went to an O.B./G.Y.N. that was
       recommended to me because she was a female.

Q      You sought medical treatment over those few
       weeks?

A      Right.

Q      I'm going to ask you to look at some pictures,
       Amy, while I set up this overhead projector.
       I'm going to ask you if you recognize what's
       in them, okay?

       MR. CONWILL:   Could we approach?

       (Off the record.)

       (State's Exhibits 1-5 marked for identification.)
       [**not in the record before this court**]

Q      Amy, do you recognize what's in those pictures
       that you just looked at?

A      I do.

Q      All right.  I'm going to ask you to take these
       one at a time because Julie has them marked
       with some stickers for us already.  This is
       what's been marked as State's Exhibit 1. Amy,
       will you tell the jurors what this picture
       shows?

A     It shows bruising on my arm.

Q     Okay.  Amy, are you able to tell or do you remember which arm that is?  I know it's hard to tell from that picture.  Just if you remember.

A     Possibly my left.

Q     All right.

      MR. CONWILL:  I have no objection to them actually going in as she looks at them there. I've seen them.

      THE COURT:  Okay.  Those are State's Exhibits 1 through 5; is that correct?

      MS. GWATHNEY:  Yes, ma'am, that's correct.

      (State's Exhibits 1-5 received in evidence.)
      [**not in the record before this court**]

Q     All right.  Amy, you may be able to see over Judge's bench there.  Is what I have just put here on the overhead projector the same picture that you have just identified as bruising to your arm?

A     Yes.

Q     Amy, what we're seeing here, right here (indicated), would this be your shirt sleeve? I want to make sure we can kind of get orientation.

A     Yes.

Q     All right.  This is your upper arm where we see this bruise (indicated)?

A     Yes.

Q     Okay.  Amy, do you remember about how long after the sodomy that these pictures were taken?

A     Probably, I don't know, three or four days.

Q     Okay.  Do you remember who took them?

A     Yes.

Q     Who took these pictures?

A     O'Connor took them.

Q     Okay.   Is  that  Detective  O'Connor  at  the
      Vestavia Hills Police Department?

A     Yes.

Q     Where were these photographs taken?

A     In one of their offices.

Q     There at the police department?

A     There at the police department.

Q     Now, I'm going to show you what is State's
      Exhibit 2 and ask you what that is a picture
      of.

A     It's a picture of my wrist and hand.

Q     Okay.   Is  it  also  showing  bruises  to  that
      hand?

A     Yes.

Q     Amy, before I remove State's Exhibit 1 that
      shows the bruise to your upper arm, you had
      talked earlier in your testimony about how the
      defendant held you down.

A     Yes.

Q     Did he hold you down by your upper arm?

A     He held me down on every part of both of my
      arms.  I was fighting him .

Q     Is it your testimony, Amy, that these bruises
      area a result of that?

A     Yes.

39

Q     Did you have these bruises in any of these
      pictures that you've already look at before
      August the 14th?

A     Absolutely not.

Q     Were you hurt in any way between August the
      14th and when these photographs were taken?

A     No.

Q     This is what has been marked as State's
      Exhibit 2.  Amy, what we're looking at here is
      bruising on your wrist?

A     Yes.

Q     To your hand area?

A     Yes.

Q     This is State's Exhibit 3.  If you'll tell the
      jury what is in that picture.

A     It's my forearm.

Q     All right.  Are these bruises on your forearm
      also that you sustained from the defendant?

A     Yes.

Q     All right.  So, Amy, what we're looking at
      here in these photographs, are these bruises
      on your forearm?

A     Yes.

Q     Amy, what is in picture number four?

A     More bruises to my forearm.

Q     Okay.  Now, Amy, who – if you can, from
      looking at this picture, what part of your arm
      is that we're seeing here?

A     It's the right part of my arm.

Q     Okay.  All right.  This photograph, is it the
      underside of your arm?

A     Yes.

Q     Amy, again, these are the bruises that we're
      seeing here in the area (indicated)?

A     Yes.

Q     This is the last photograph.  It's been marked
      as State's Exhibit 5.  Tell us what is there,
      Amy.

A     That is my leg.

Q     All right.  State's Exhibit 5, and I know it's
      difficult to see on the overhead projector,
      but there is bruising here on your ankle area?

A     Right.

Q     Amy, is what you've told us here today been
      the ruth about what happened on August the
      14th?

A     Yes.

Q     Have you at any point had any motivation
      anywhere in your heart to cause pain to
      Roderick Pair?

A     No, I have not.


                    CROSS EXAMINATION

BY MR. CONWILL:

Q     Ms. Alexander, how old are you?

A     Thirty-four.

Q     I believe you stated that you presently work
      for McCloud Software?

A     Yes.

Q      At the time of this incident, August the 14th
       I believe, of 2003, where were you working?

A      Burr and Foreman.

Q      What were your phone numbers there?

A      My phone numbers there?

Q      Yes, ma'am.

A      458-5117.

Q      Do you have a cell phone?

A      Yes.

Q      What was that number?

A      I don't recall that number.

Q      You don't recall?  What was your home phone
       number at that time?

A      979-5891.

Q      Your cell phone?

A      I do not recall that number.  It's been a
       while.

Q      I will come back to that question in a minute.
       I believe you had stated that you and Roddy
       had met at Hogan's?

A      Yes.

Q      How long had you, at that time when you first
       met, been frequenting Hogan's?

A      Not very long.

Q      Did you know and meet – know some of the other
       people that frequented that place?

A      My friend, Carolyn Case, was there.

Q      Now that was the night that you say y'all
       first met?

A      Right.

Q      Carolyn Case. What about any of the other
       nights? Do you know some of the people that
       regularly go to Hogan's?

A      At the beginning of that time, no.

Q      Well, do you know since that time? Could you
       think back and identify someone?

A      Possibly. I don't know that I would know their
       names.

Q      Is there a fellow they call Gator?

A      Yeah, I do know him.

Q      Do you remember the man or boy, whatever you
       want to call him, that kind of kept the door?

A      I don't know his name.

Q      Was it Haltiwanger?

A      I don't know his name.

Q      Do you remember, though, in your mind what he
       looked like?

A      Yes.

Q      It's my understanding you stated that you
       didn't know Roddy Pair until the night that
       you first met him at Hogan's, and I think you
       said your girlfriend was with you; is that
       correct?

A      That is correct. And, I had a date with me as
       well.

Q      Who was the date?

A      I don't recall. It was a blind date and quite
       boring.

Q      Approximately, what time of the night, if you
       remember, did you see Roddy to have any kind
       of contact with him at all that night?

A      I don't recall the time.

Q      Where did you live at that time?

A      In Gardendale.

Q      When was the first time that you and Roddy
       went on a date?

A      Maybe it was a week or so after that.

Q      Y'all had no conversations, that you remember,
       between the time y'all met until you went on a
       date?

A      We may have had phone conversation.

Q      Did y'all talk quite a bit on the phone?

A      I cannot recall.

Q      **You don't remember whether you talked very
       much on the phone**?

A      **I don't recall how much I may have talked to
       him during that time, no.**

Q      **Do you have a judgment in relation to the time
       of August the 14th, '03 until this time before
       that that y'all went on the date?  I think you
       said that you went to dinner or supper.**

A      **Right.**

Q      **Do you know how far away that was from this
       August 14th date**?

A      **I would say a month or so, probably.**

Q      Where did y'all go?

A      I think it was – it's at the Summit.

Q      Was it Tavern at the Summit?

A    It's the first one as you go into the Summit.

Q    Okay.  I think you said on that occasion – was
     that occasion when y'all - this was your first
     date I'm taking it?

A    I think so.

Q    Where did y'all go after you had dinner?

A    Probably to my house.

Q    **Did he spend the night**?

A    **I really can't recall.**

Q    You don't recall that one way or the other?

A    No.

Q    **Did you have sex**?

A    **Well, we have had.  I don't know that it was
     that night.**

Q    Well, I'm particularly asking about that
     night.  Did you have sex that night?

     MS. GWATHNEY:  Judge, I'm going to object.
     He's asked the question and she's answered it.

     THE COURT:    I'll let him ask it one more
     time.  Overruled.

Q    **Did you and Roddy Pair have sex that night
     after you went to dinner**?

A    **I cannot remember.**

Q    After that date, when was the next time that
     y'all had anything that you would call a date?

A    Sir, that's been a long time.  **I don't
     remember.**

Q    **How many dates did you have with him**?

A   **They were minimal.  I mean, maybe three or four.**

Q   Okay.  **How many times did you have sex with him prior to incident that you reported**?

A   **Maybe twice.**

Q   Do you remember where they were, the location?

A   At my home.

Q   In Gardendale?

A   In Gardendale.

Q   I believe you stated that you had gone to Greece at some point?

A   Yes.

Q   Stayed two weeks?

A   Yes.

Q   **Did you call Roddy from Greece**?

A   **Yes, I did.**

Q   **How many times**?

A   **I don't remember.**

Q   **You have no judgment**?

A   **It could have been several.  I went to Greece alone and I didn't speak Greek.**

Q   **Would it have been as many as maybe twenty**?

A   **I don't know if it was that many.**

Q   I mean, could it have been twenty times?

    MS. GWATHNEY:  Judge, I'm going to object to the foundation of this question.  I mean he's asked and she doesn't know the answer.

THE COURT:      Sustained.

Q     **Did there come a time when Roddy objected to
      you calling him all the time**?

A     **I don't think so.**

Q     **He didn't, in fact, tell you to quit calling
      him**?

A     **I don't recall that.**

Q     **You're saying that you have no memory of that
      one way or the other**?

A     **No, I don't.**

Q     **In fact, did Roddy tell you that if you didn't
      quit calling him he was going to report it to
      the police**?

A     **I don't recall that.**

Q     **How far is your home from Hogan's**?

A     **Which**?

Q     **Over in Vestavia.**

A     **Maybe ten, fifteen minutes.**

Q     Go back to the date of August the 14th.   Do
      you remember what you did that day?

A     I went to work that day and then I attended a
      birthday party at a Mexican restaurant with my
      friends.

Q     What time did you get home?

A     I don't recall what time.   I don't think it
      was late.

Q     **Did you call Roddy that night**?

A     **Yes, I did.**

Q      **How many times**?

A      **I think I just called him once.   The first
       time when he showed up; and then, the second
       time to ask him why he had hurt me.**

Q      **Did he, in fact, tell you that night when you
       called that he wanted you to quit calling him**?

A      **Why, of course, he did.**

Q      When you called him, do you know where he was?

A      No.

Q      You have no judgment whatsoever where he was
       when you called him?

A      No, I do not.

Q      **In August of 2003, were you having some
       emotional problems**?

       MS. GWATHNEY:  **Judge, I object.**

       THE COURT:     **Sustained.**

Q      **You stated to the jury that you ended the
       relationship**?

A      **That is correct.**

Q      In fact, didn't Roddy end the relationship?

A      No.

Q      In fact, at that time didn't you know that he
       was actually seeing another girl?

A      **I ended the relationship because, as a single
       female, I checked him out and found that he
       had prior convictions of identity theft.**

       THE COURT:     Wait one second, ma'am.

       MR. CONWILL:   May we approach?

            THE COURT:      Ladies and gentlemen, I'm going
        to ask that you please go back in the jury
        room.

(**emphasis added**).

                            * * *

The trial judge, after hearing argument, denied Conwill's motion

for a mistrial.

                            * * *

    The State's next witness was Ms. Farner, the nurse who

conducted the sexual assault examination on A.A. on the night of

August 14, 2003.

        Q    What is the first thing that happens when you
             meet with a woman at the Rape Response Center?
             Start with us from the beginning.

        A    Okay. Usually they are brought to us by law
             enforcement.  We're told ahead of time only
             that they are a victim of sexual assault.
             They come in.  Usually the first step is to do
             an interview.  My goal with the interview is
             not necessarily to get a lot of information
             about the assailant, per se, but just to know
             what happened.  To know what exactly happened
             to her as far as, you know, any harm or
             potential harm or threat that was related
             across to her so that I know exactly what
             evidence to gather and what injuries to look
             for.

        Q    So, is it fair to say that you're not trying
             to find out what happened that night for just
             the sake of just finding out, but it has a
             purpose?

        A    Absolutely.  I'm trying to know how I need to
             guide the rest of my exam.

                             49

Q    And is the information that that person, that
     victim, gives to you, does that help you
     decide what things you will collect and what
     areas of her body you will pay attention to?

A    Absolutely.

Q    Let me stop you for one moment.  Let's talk
     about those aspects, that somebody is brought
     to you by law enforcement and that you
     conducted an interview on the night of August
     the 14.  Was Amy Alexander brought to you by
     law enforcement?

A    I believe so, yes.

Q    Did you have that interview time with Amy
     Alexander before you ever examined her?

A    Yes, I did.

Q    Did she tell you what had happened that night?

A    Yes, she did.

Q    All right.  Now, after that interview process
     tell us what happened next.

A    After the interview is complete, then we move
     into the examination room.  We start the exam.
     We just go though the exam.

Q    All right.  Now, is this what we would
     commonly understand as an exam where you take
     things that are put into a rape kit?

A    Yes.  That's part of the exam, correct.

Q    Okay.  Tell us, if you would, just briefly
     what a rape kit is.

A    Okay.  A rape kit or sexual assault evidence
     collection kit is a kit.  It's a box that
     contains several envelopes and pieces of
     paper.  It's used – actually the state of
     Alabama has a kit that's used through the
     state.  It's provided by the forensics lab.
     We use that kit and follow specific

50

instructions to gather evidence from clothing to debris to DNA samples, blood, swabs, everything. It follows a specific order and then we go through that order and collect the evidence as we proceed through the exam.

Q    Ms. Farner, is this a rape kit?

A    That is correct.

Q    So, a box?

A    Uh-huh.

Q    Now, is every box the same?

A    Every box is the same and it comes to us sealed.

Q    Okay. So when you get a box and want to do an exam, you have break a seal –

A    Yes.

Q    – to be able to get into it?

A    Yes.

Q    Okay, briefly, if you would, describe for us what a woman would go through during the exam. What kind of things are done and if they are routine most of the time.

A    Okay. Yes, almost every victim goes through the same – patient goes through the same exam. They are allowed to undress over a piece of paper. I take each piece of clothing and place that into a bag and seal it. Once they have undressed completely they are placed on, usually, a pelvic stretcher or a stretcher of some kind. I proceed to examine them all over to make sure that they don't have any injuries or that there's not any debris or secretions on there that I would need to collect for the kit. I use what's called a "Wood's lamp", which is an ultraviolet light source that sometimes allows things that I can't see under a normal eye to show up, whether that be

bruises or secretions.  And then, once they are on the stretcher we cover them back up and kind of proceed head to toe with the exam, as well as collecting some of their hair.  Cut pieces of their hair.  We may take a swab of the inside of their mouth.  We get pieces – cut pieces of their pubic hair.  Take a look at the genital area, which includes swabs of the inside as well as of the outside, and usually proceed to a speculum exam, which is the piece of equipment that goes inside the woman to allow them to look on the inside of the female parts.  Look in the rectal area and collect swabs from that area as well.  And then, usually collect some blood as well.  So, it involves a stick with the needle to get some blood from the patient.

Q    It sounds fairly invasive.  Would that be a fair description?

A    Yes.  Absolutely.

     (State's Exhibits 6 & 7 marked for identification.)
     [**not in the record before this court**]

Q    I'm going to ask you if you recognize what State's Exhibit 7 is?

A    Yes.  This is the kit I collected that night.

Q    Okay.  And that is the kit for Amy Alexander?

A    Correct.

Q    How can you tell that that's the kit that you collected and what that exhibit's from?

A    Because I documented her name and the date as well as my name and signature are on here.

Q    Okay.  I'm going to ask you to open this.

A    Okay.  (Witness complied with request.)

52

Q       If you could, just kind of look through there
        and tell us if that looks like all of the
        items that you collected that evening.

A       Correct.  This is a copy of the documentation
        that I did that night, and then these appear
        to be the envelopes that I collected.  They
        all have my handwriting on it.

Q       Now, you said your report; is that right?
        That's enclosed in the box?

A       Yes.

Q       I want you to walk us through the envelopes,
        what you have there, and what it tells you is
        taken from the victim.

A       Okay.  Now, these aren't in the order that I
        collected them, but the first envelope are the
        rectal swabs and **I collected two swabs from
        the rectal area**.  Also, a smear, which means
        that I took the swab and kind of ran it across
        a microscope slide.  Allowed it to dry and
        then placed it in the envelope.  There was
        some oral swabs I collected here.  **A genital
        swabbing, which is like a little gauze pad
        that's moistened slightly and used to wipe on
        the outside of the genital area to collect any
        secretions.**  Head hair cuttings where I cut
        her hair.  The pubic hair cuttings where I cut
        her hair.  Pubic hair combings, which we take
        the comb, **I neglected to mention this earlier,
        and comb through the pubic hair in hopes of
        collecting debris or stray hairs.  The vaginal
        swabs and smear.**  This bag is foreign
        material.  Actually what this is, is Ms.
        Alexander was wearing a pad when she came to
        the Crisis Center and I collected that.  I
        allowed it to dry and place it in the bag as
        well.

Q       Let me interrupt you for one moment.  When you
        allowed it to dry, do you remember what
        substance was on that pad?

A    I think it was blood, but I can't remember for
     sure.  I'm pretty positive it was just blood
     on there.

Q    All right.  Go ahead and tell us what else is
     in the box.

A    Okay.  The foreign material, this is actually
     the piece of paper when she was standing and
     disrobed, I just folded that up and placed it
     in here.  So anything that fell from her body
     while she was undressing would be in this bag.

Q    Is that everything that's in the box?

A    These are forensics.  These were not in the
     kit.  I mean, I think they take these out and
     do something with them.

Q    Okay.  But those would have been placed in the
     kit at the Department of Forensic Sciences?

A    Right.

     MS. GWATHNEY:  Judge, at this time we are
     going to offer the rape kit into evidence.  I
     believe it's marked State's 7 along with the
     contents of the box.

     THE COURT:     Mr. Conwill?

     MR. CONWILL:   I have no objection.

     THE COURT:     Give Julie a minute to mark it in.

     (State's Exhibit 7 received in evidence.)
     [**not in the record before this court**]

Q    Now, we know that all of these things were
     collected, Ms. Farner.  All of the combings
     and items in all of those envelopes that
     you've just told us.  There is also a medical
     examination that is done; is that correct?

A    Yes.

Q    Now, you told us earlier that you conducted an
     interview with the victim, Amy Alexander, to

have a better idea of what you were looking for; is that fair to say?

A     Yes.

Q     If you would, tell us what information she gave you that night about the assault.

A     Okay.  Just read what I documented?  Would that be –

Q     That would be fine.

A     Okay.   My narrative,  or  kind  of  my paraphrasing of what she told me was: **"The victim reports that a known person came to her house, ripped her clothes off and begin having sexual intercourse with her.**  He then became very aggressive and hurtful holding her arms down.  He penetrated her rectally.  After the event, struck her in the forehead knocking her to the ground.  **She had a questionable loss of consciousness,** meaning she was knocked out for an unknown time.  When she came to the perpetrator had left."

Q     Now knowing the areas of the body the sexual assault affected, what did you – tell us about the exam that you conducted.

A     Okay.  I took a look at her body to see if she had any bruises because she had reported that he had held her down with his hands and that he had struck her.  So –

Q     Had any bruises appeared at that point in time?

A     **I did not see any bruises on her body at that time, no.**

Q     Now, Ms. Farner, is that unusual?  Do bruises occur quickly or does it depend from person-to-person?

A     It's very dependent on person-to-person, yeah. Sometimes  they  show  up  right  away  and sometimes they don't, which is another reason

55

we use the alternative light source. Although
those work – the alternative light source is
more helpful with persons of color. They tend
to show up bruises better on persons of color.

Q      But just because you didn't see any bruises
doesn't mean that there weren't some in
formation. Would that be a fair statement?

A      That's correct.

Q      All right. Go on and tell us what happened
next in the exam.

A      Okay. Once we have looked over the rest of her
body, then we proceeded to do the genital
exam. We placed her on the stretcher and put
her in stirrups so that I could examine her
genital area. That's where she had evidence
of trauma and injury.

Q      Okay. When you do the exam, Ms. Farner, you
also take pictures; is that right?

A      That's correct.

Q      Okay. Do you have some of those photographs
with you?

A      Yes, I do.

        (State's Exhibits 8-15 marked for
        identification.)
        [**not in the record before this court**]

Q      Okay. As part of your exam, did you also do a
diagram of any injuries that you saw?

A      Yes, I did. Sometimes technology doesn't
always work out.

Q      Okay.

A      I always – we always do diagrams as well.

Q      I'm going to ask you if this is a fair
depiction of the diagram that is in your
report?

A     Very much.

Q     All right.  Now, you may need to come down
      here with me.  Let's start here.  If you will,
      tell us what we're looking at in this diagram
      and explain to the jurors what it means.  What
      you have marked here.

A     Okay.   There is essentially a picture of
      female genitalia.   This area along here is
      what's called the labia majora or the outer
      lip of the female genitalia.   This is right in
      front of here (indicated) would be the opening
      into the vagina.   This is the hymen, the
      clitoris.   This is where the urine comes out
      (indicated), the urethral orifice.   This area
      is just the tissue, the band of tissue, that's
      between the vagina and the anus.   This is the
      anus or the rectum, and then, you know, the
      buttock.

Q     Ms. Farner, is this your handwriting that
      appears on the diagram?

A     Right.

Q     What does the handwriting that we see
      indicate?

A     Okay.   I've written on either side here
      bruising.  She had on either side of her labia
      areas of, you can refer to the medical term,
      "petechia", but essentially were small
      pinpoint bruises where blood vessels had
      burst, blunt force trauma.

      And then, these lines that I have drawn right
      here (indicated) and the one that goes all the
      way up here (indicated) were lacerations.  **She
      had several – two lacerations here that I
      depicted that extended from her and just all
      the way up to what's – this area is called te
      "posterior fourchette."  That's just the area
      right there below the vagina.**

Q     **Let's talk about those lacerations for a
      minute.  Describe for us the extent of that
      laceration in lay people terms.**

A     **Okay.  It was pretty extensive.  Like I said,
      it extended all the way up – I would call
      that, probably, three centimeters.  About an
      inch and a half, maybe.  Maybe inch to an inch
      and a half long.  Very obvious to the naked
      eye.  You can see it without any kind of
      magnification.**  I guess it would be, for the
      woman, this would be kind of like a second or
      third degree episiotomy.  **So it was pretty
      deep.  She was still oozing out of her rectum
      mildly.  She still had some oozing, very
      minimally, from that laceration that we see
      here** (indicated).

Q     Anything else about that laceration?  Can you
      tell us how deep it went into the flesh or
      those kind of things?

A     No, not really.  I mean, **the laceration was
      kind of flayed open a little bit.  It's hard
      to tell how deep it appeared.  Probably a
      quarter of a centimeter wide.  But the tissue
      was together and it kind of fell apart.**  So, I
      really couldn't tell how deep.

Q     Okay.  But obvious to the naked eye?

A     Definitely.

Q     All right.  What else do we see here from your
      handwritten notes?

A     The only other thing I documented here was
      hematoma, which is another medical term for a
      bruise.  **She had – this was a dark, purplish
      color looking bruise that was right there at
      the base of her rectum.**

Q     Okay.  Did the bruising that you noted here on
      this side (indicated), as well as on the right
      side, does that indicate anything to you?

A     **It just indicates blunt force trauma.**

Q     **When you say, "blunt force trauma," again,
      tell us the lay person term.**

A   **The difference that is made is between penetrating trauma and blunt force trauma, penetrating with like a sharp object. Something, you know, sharp that would cause a laceration. Something blunt, something like a fist or, you know, hammer.** Something that doesn't have a sharp edge to it. Hitting an object, one force against another causing a bruise.

Q   And then there is a laceration here (indicated). Was there an injury to the anus area or rectum area?

A   Yeah. That actually – the bruise was to the anus area and the laceration started, you know, what we call the "anal verge", it's just the edge – the inside edge of the anus. It started there and expended all the way up to the top of the actual anus itself versus starting here (indicated) and working its way down. I know that it came from the anus and worked its way up.

Q   Okay. The injury?

A   Yes. Working from this direction up (indicated), correct.

Q   I'll let you sit back down and we'll leave that for a moment.

A   Okay.

Q   You've been qualified as an expert, please tell these jurors if what you saw that night when you did this exam – the first question is, was it consistent with the victim and what she has told you had happened to her during the assault?

A   Absolutely.

Q   Were her injuries consistent with consensual sex?

A   **Anything is possible, but these injuries were so extensive and so painful to her that I**

**couldn't even do as thorough of an exam as I would have liked.  When I tried to touch her or move her or manipulate her she would cry and flinch and move off the table.**

Q    Was she in pain?

A    Absolutely.  Absolutely.  Yeah, there's no way these could not hurt.  These are sensitive areas to begin with.  I didn't even attempt to do a speculum exam with her because these were so obviously – it was the worst, you know, rectal trauma that I had ever seen.  It stood out in my mind.  It was, you know, obviously painful.

Q    How long have you been doing these exams?

A    2001.  For four years.

Q    **And it's the worst rectal** –

A    **Yeah.**

Q    **– you've ever seen**?

A    **Yeah.  I do peer review and see other exams, you know, pictures and things like that and I've never seen anything like this.**

Q    Do you have an estimate of how many exams you have participated in or done peer review on since 2001?

A    Since 2001 I've done over two hundred and some odd exams and – well, probably another hundred or more general review and things with colleagues and through classes and other educational offerings that I've gone to where pictures have been shared.

Q    You seemed to indicate a few moments ago in your testimony that because of the nature of the injuries that there were some parts of the exam that you weren't able to do?

A    Correct.  Normally, we take a speculum – when we gather the vaginal swabs we put a speculum

60

in so that we can see the inside of the vagina
and cervix, and then collect the swabs with
the speculum in because that's the most likely
place to find DNA is at the cervix.  But the
speculum, when you put it in and open it, the
pressure is downward.  Down towards the bottom
of perineum and down towards the anus, and I
just didn't think she would be able to
tolerate the exam so I didn't even try it.

                    *  *  *

          CROSS EXAMINATION BY MR. CONWILL

Q    **I believe you stated that the injuries that
     you observed in her genital area was from a
     sharp object**?

A    **No, from blunt.  Blunt.  Most likely blunt.**

Q    **Oh.  I thought you said sharp and blunt.**

A    **No.  I was trying to differentiate between the
     two.**

Q    **Oh, I'm sorry.  You said a "blunt object"**?

A    **Correct.**

Q    **And that blunt object could be any kind of
     blunt object, couldn't it**?

A    **Yes, sir.**

Q    **It could be a fist**?

A    **Yes.**

Q    **It could be a Coke bottle**?

A    **Yes.**

Q    **Anything blunt would cause that same injury**?

A    **Yes, sir.**

                    *  *  *

                      61

Q    And it's sexual assault because it's the
     sexual area that's being assaulted?

A    Correct.

Q    **You're not saying that it was done necessarily
     by a penis, are you**?

A    **No.**

Q    **You don't know**?

A    **I don't know.   That is correct.**

Q    **It could have been a Coke bottle or a fist,
     but it's sexual in nature because of where the
     assault occurred**?

A    **That's correct.**

(**emphasis added**).

                    *   *   *

This court will not set forth *in haec verba* the testimony of
Pair or of his alibi witnesses, although that testimony was
obviously important to the jury, to the trial court, to the state
appellate courts and to the magistrate judge.   The court does,
however, agree with Conwill's assessment that his alibi witnesses
were about as good as they get.   The jury, of course, bore the
responsibility for evaluating the demeanor of all witnesses and for
ultimately assessing their varying degrees of credibility.   The
main alibi witness, Ms. Dunn, a former girlfriend of Pair,
testified unequivocally that Pair was never out of her sight on the
night in question.   She was unshaken on cross-examination.

In addition to Pair himself and the alibi witnesses, Conwill offered the testimony of the investigating police officer, as follows:

Q    Turning over to the next page.  Looking at halfway down, could you read to us what you wrote down and does this come from the complainant, what she told you?

A    Yes.

Q    Read that please.

A    Between listed time the victim stated that: "The suspect came to her residence.  The victim stated that she does not know how the suspect found out where she lived.  **Victim stated that after some chitchat with the suspect, her ex-boyfriend, they began, quote, 'ripping each other's clothes off.'  Victim stated she then began having consensual sex with the suspect.  Victim stated that after a brief period of engaging in vaginal sex the suspect then inserted his penis in her anus.**  The victim stated she then told the suspect, 'Stop.  You're hurting me.'  At which point the suspect responded by stating, quote, 'You hurt me.  This doesn't mean anything.  You have to have emotion and this doesn't mean anything.'  **Victim stated that the suspect then struck her on the forehead and knocked her to the floor with his hand.**  Victim was not sure if the suspect struck her with his open hand or closed fist.  **Officer observed no signs of injury to the victim's forehead.  Suspect then got dressed and left.  Victim stated she called the suspect on his cell phone and asked, 'Rod, what are you doing?'  The suspect then told the victim that he had notified the police.  Victim then hung up with the suspect and called 911.**  Victim stated she was bleeding from her anus and saw some blood on her bedroom floor, which she cleaned up.  Victim stated she still had the panties she had been wearing, which had blood on them.

Victim stated she washed the panties but they
still had blood on them.   Sergeant Granger,
number 604 on the scene.   Evidence Technician
O'Connor, number 718, on the scene.   Corporal
Summerlin,   number   713,   notified.     Victim
stated the suspect never ejaculated.   Victim
transported to SANE center by 718."

Q     **After you wrote that report, did Ms. Alexander
sign the report**?

A     **Yes.**

(**emphasis added**).

### Pair's Criticisms of Conwill's Performance

As this court understands Pair's post-conviction arguments,
his predominant contention always was that the conviction came
about because Conwill did not submit expert psychiatric testimony
to prove that A.A. was mentally unstable and in such an emotional
state after being rejected by Pair that she was capable of the
irrational act of self-penetrating her anus in order to punish
Pair.   The court agrees with the magistrate judge's rejection of
this line of attack on Conwill's trial performance, particularly
inasmuch as the state trial judge herself made it clear to Conwill
that he would be wasting his time if he tried to question A.A.'s
mental health.   Nevertheless, this court might have agreed with
this particular challenge to Conwill's performance, that is, **if
Pair had filed an objection to the magistrate judge's conclusion
that psychiatric testimony about A.A.'s mental health would not
have adversely affected the trial outcome.**   In this court's

64

opinion, Pair's argument that psychiatric testimony about A.A. would have bolstered his defense is a more persuasive argument than either of Pair's complaints about Conwill's performance that the magistrate judge found constitutionally deficient.

Conwill's first alleged shortcoming that the magistrate judge found fatally prejudicial to Pair was Conwill's failure to offer two postcards that A.A. had sent Pair from Greece. In this court's opinion, the cards were no more than confirmation of A.A.'s concession that she placed up to twenty telephone calls to Pair from Greece. She incredibly said that her calls to Pair were because she didn't speak Greek. The postcards were hardly necessary to disprove A.A.'s assertions that it was **she who had rejected Pair and not** *vice versa*, and that she had parted ways with Pair because she investigated him and found out that he had a criminal record. If one of the postcards had contained a suggestive picture of Aphrodite in *flagrante*, the criticism of Conwill for not offering it as proof of A.A.'s intent to sexually re-excite Pair might make sense. As it was, the postcards were cumulative and, if the jury had examined them, were hardly of sufficient importance to have tipped the scales in favor of Pair. The failure to offer the postcards does not rise to the *Strickland* standard for a mistake that, in all likelihood, adversely affected the outcome. If A.A. had denied sending postcards to Pair, which

she did not, Conwill might have been obligated to confront her with them.

The other allegedly dispositive fault the magistrate judge found with Conwill's performance was Conwill's failure to search for, to find, and to offer the testimony of William T. Gaut, or some similar "expert" to opine that the attack, as described by A.A., was physically impossible.  Gaut's affidavit first appeared in support of Pair's post-conviction motion presented to the trial court.  In pertinent part, Gaut's affidavit, unpersuasive to the trial court and to the state appellate courts on post-conviction review, was considered *de novo* by the magistrate judge, and is now considered *de novo* by this court.  In addition to the usual litany of professional experience, Gaut swore to the following:

> My name is William T. Gaut and I am over the age of nineteen (19) years.  I have been retained by Roger C. Appell to review pertinent trial transcripts of Roderick Pair, Jr. And to give my opinion as to the adequacy of the defense presented by the attorney for Mr. Pair. [**the ultimate question in the state court post-conviction proceedings, and in the federal habeas proceeding**]
>
> **\* \* \***
>
> My understanding of the facts in this case is summarized as follows:
>
> Amy Alexander testified at trial that on August 14, 2003, **she was actually speaking to her ex-boyfriend, Roderick Pair, on the telephone when he suddenly appeared at her residence door. She testified that she invited him inside and after a brief exchange of "a hug and a kiss"**, she began to show him around the residence.  When they arrived at her bedroom doorway, she states that Mr. Pair suddenly tore off her clothing, held her face down on the floor and raped her anally.  **When she complained of pain,**

**he stopped the intercourse** and struck her forcefully in the forehead knocking her unconscious.  **When she awoke, she called Mr. Pair to ask "why he had hurt her."  She then called the police to report the rape.**

It appears clear to me based on my investigation of this case that there were only three possible scenarios of how this victim received the injuries that were presented to the jury.  First, that Roderick Pair did in fact commit the act as testified by the victim.  Second, that the victim received the injuries from another person and was lying when she testified that Roderick Pair was the perpetrator.  Third, that the victim's injuries were self inflicted and that she had fabricated the entire incident.

I understand that Roderick Pair presented an alibi defense and presented several witnesses who testified that he was with them at the time of the alleged incident.  I also understand that Roderick Pair did not present any physical evidence to corroborate that he was not present at the victim's home when the events occurred.  I further understand that the State could not present any physical evidence or witness to corroborate the testimony of the victim.  Simply put, **the State's case was based totally on the credibility of the victim.**  Roderick Pair's defense was based totally on his alibi.

The problem with the defense was two fold.  First, the victim's credibility was bolstered by the fact that there was uncontroverted evidence that something had penetrated her anus.  Second, she had known Roderick Pair prior to this incident and there was no question or issue as to whether or not she could positively identify him as her assailant.

Based on these two undisputed facts, **it is my opinion that basing a defense solely on an alibi had little or no chance of being successful.  It would have been my opinion at the time and it is my opinion today that a competent defense attorney would have attempted to present additional evidence to counter the testimony of the victim.**

**First, it is my opinion that the defense should have presented testimony from an expert witness such as myself**

**concerning the allegations of how the alleged incident occurred.**

**My experience in investigation of sexual assault cases is that while it is possible to forcibly rape a female anally, it is highly difficult and unlikely to be done without the use of some lubricants and consent of the female.  In my years of investigating sexual assault cases, I cannot remember any cases similar to the facts that were alleged by the victim in this case where an average sized male was able to anally penetrate an average sized female by simply holding her down without any restraint or help by a third party.**  I saw no mention in the testimony of any lubricants being used by the assailant nor any evidence of any lubricants found in the "rape kit" test, nor any testing that was done for lubricants.

At the time of Roderick Pair's trial, I was available to testify as an expert witness and would have testified if asked to do so.  If I had been retained by counsel for Roderick Pair, I would have certainly advised him as to my expert opinions as stated above and advised him that my opinion would have been essential to help establish that the events as descried to have occurred by the victim would have been if not impossible at least highly improbable and unlikely to have occurred as described by her to the police and in court.

**I have also been advised by present counsel for Roderick Pair that the alleged victim was experiencing psychological problems at a time to her allegations. Based on what I have stated above, I would have advised counsel for the defendant to begin an extensive investigation into her psychiatric history and to consult with an expert in that area to help establish the defendant's defense that the victim was fabricating the entire incident and that she caused the injuries to herself.**

(**emphasis added**).

Gaut's use of the words "forcible rape" suggests that he thinks that rape, other than statutory rape, can be committed without force, either physical or psychological.  This does not comport

68

with the law of Alabama.   Gaut also purports to sit in judgment
broadly on Conwill with respect to trial strategy with which the
magistrate judge found no constitutional fault.   Furthermore, if
Conwill had anticipated and tried to follow Gaut's advice,
evaluated from the clairvoyant vantage of hindsight, he would, in
the judgment of this court, have met a formidable obstacle in the
trial judge herself.   Even without the constraints of *Daubert*, the
trial judge would probably have looked just as askance at Gaut as
this court would have under *Daubert* constraints.

## Analysis

There was nothing Conwill could have done about three crucial
undisputed facts: (1) that his client was a convicted felon, (2)
that his client had had a prior sexual relationship with A.A.; and
(3) that on August 14, 2003, A.A. sustained an unusually severe
anal injury.   On the other hand, there was nothing the prosecution
could do about another three undisputed facts: (1) that the lovers
had broken up, shortly after which A.A. took a trip to Greece; (2)
that A.A. made numerous telephone calls from Greece to Pair
(purportedly because she didn't speak Greek); and (3) that after
she returned from Greece, she, on August 14, 2003, called Pair on
his cell phone twice, once late at night, and again after the
traumatic event in which he sodomized her.   A.A. says she did not
give Pair her new Vestavia address, but nevertheless he showed up

late at night on her doorstep uninvited while they were talking on his cell phone during a call she had initiated.

Within a matrix of facts, both undisputed and disputed, is found substantial evidence to justify the guilty verdict reached by the jury.  The impartiality of the jury is not questioned.  The same evidence could just as readily have led to an acquittal, a fact that justifies Conwill's (1) failure to offer postcards from Greece and (2) his failure to locate Gaut or someone like him, if there is anybody else like Gaut.  To restate the obvious, there was just as much evidence, including logical inferences, upon which the jury could have found Pair "not guilty" as there was to find him "guilty".  Only the jury knows its reasons for what and whom it believed, and what evidence might have changed the jury's collective mind if that evidence had been presented by Pair.  The court can only speculate about the process by which the jury arrived at its verdict.

The court has already expressed its belief that the postcards were unnecessary surplusage and certainly were not crucial to the trial outcome.  Also, as stated, if A.A. had denied sending Pair postcards, Conwill would undoubtedly have produced them.  Under the circumstances, not introducing the cards was innocuous.  There was ample, uncontroverted proof that A.A., while in Greece, initiated communication with Pair seeking a renewal of their relationship.  Her explanation ("I didn't speak Greek.") for making numerous

telephone calls from Greece to a person she had rejected because he was a convicted felon is implausible at best.  Pair was someone she admits she had had a love affair with, and high regard for, but someone she says she deliberately rejected after finding out he was guilty of identity theft.  In another breath, she describes the break-up as simply the two lovers having "drifted apart".  Her subsequent, if denied, attempt at rapprochement with Pair admittedly was unsuccessful, at least until August 14, 2003.  The trial transcript says: "Did Roddy tell you that if you didn't quit calling him he was going to call the police?"  "I don't recall that."  Then, on August 14, 2003, A.A. admits she called Pair twice, once before the alleged attack and again shortly after the attack.  To make a telephone call to your brutal rapist-sodomizer while bleeding from the rectum, before calling the police, is, to say the least, bizarre.  Yet, A.A. was quick to blurt out to the jury that Pair was a convicted felon.  She had earlier testified that Pair was a person she was fond of and against whom she harbored no ill will.

The primary fault the magistrate judge found with Conwill's performance as Pair's trial counsel was not his failure to offer the postcards, but his failure to offer an expert to opine that an 185 pound, 6'2" man cannot anally penetrate with his erect penis a resisting 150 pound woman, that is, unless it is "with the consent of the female" or is "with third-party assistance", or "by using a

lubricant".  A.A., of course, did not identify any third parties who assisted Pair to sodomize her.  No lubricants were found by the nurse.  If, as the gatekeeper under *Daubert*, this court had been called upon to pass upon Gaut as someone qualified to voice the ultimate opinions he expressed in his affidavit, ending with the opinion that Conwill's performance was so poor that it was likely the reason for Pair's conviction, Gaut would not have gotten through the gate.  The ultimate conclusion reached by Gaut was:

> **My experience in investigation of sexual assault cases is that while it is possible to forcibly rape a female anally [this court thought that "rape" was, by definition, forced"], it is highly difficult and unlikely to be done without the use of some lubricants and consent of the female. [the court thought that rape was always without the consent of the female].  In my years of investigating sexual assault cases, I cannot remember any cases similar to the facts that were alleged by the victim in this case where an average sized male was able to anally penetrate an average sized female by simply holding her down without any restraint or help by a third party. [How did Gaut test this theory empirically?  Where is the peer review?]**

(**emphasis added**).

It is difficult to see how Gaut, if he had been allowed to testify, could have done more than to provoke a debate in the jury room about whether, without actual experiments to prove or disprove it, a 185 pound, 6'2" man can sodomize an unwilling 150 pound woman. This court concedes that the effect of Gaut's proposed testimony, if it had been allowed (and this court has already expressed its belief, based upon her rulings, that the trial court would have

allowed it), is a matter for legitimate debate.  If the trial court had allowed Gaut to state his highly subjective and speculative opinions, neither peer reviewed nor empirically tested, his credibility would surely have been called into serious question or cross-examination by the prosecutor.  Gaut had to admit that he had never seen or heard of anything like this before.

This court would not have envied Conwill if he had offered Gaut, and had gotten by the prosecutor's objections, and as a result the jury heard Gaut.  Conwill would have forced himself into making the following closing argument:  **"My client wasn't there on August 14, but if he was there, he couldn't have done it."**  To offer Gaut could have materially subtracted from the testimony of Pair and of his alibi witnesses.  To decide not to present an entirely inconsistent, alternative defense, was well within the professional standards of criminal defense lawyers as this court understands the standards.  To clinch this court's disagreement with the magistrate judge on this point, this court, if it set aside the jury verdict and ordered a new trial, in order to be consistent and achieve its purpose, would have to order Pair's trial counsel to offer Gaut, or someone like him, and to order the state trial judge to allow the evidence.  This court cannot bring itself to order a state court trial judge to receive opinion evidence this court would not allow.

The absence of the postcards and the absence of a rape expert, considered separately, or in combination, were found by the magistrate judge not only to have been serious errors of judgment by Conwill, but in all likelihood to have been critical to the guilty verdict.   This court respectfully disagrees with the magistrate judge.   While evaluating Conwill's competence, this court must assume that the prosecutor was equally competent. Therefore, the court necessarily gives the prosecutor credit for exploiting natural sympathy for A.A., while attacking Pair's credibility.   After all, Pair was a convicted felon, against whom A.A. says she had no animosity after a breakup that she initiated. If Conwill was going to deviate from Pair's categorical denial of any sexual misconduct whatsoever on August 14, 2003, he had a more than adequate evidentiary basis for arguing that A.A.'s anal penetration came only after consensual vaginal sex had begun and that the sex got a little rough.   Such an argument would have been entirely consistent with A.A.'s following statements to the police. "I'm sure there was a hug and a kiss."   "The police report talks about how this began as a consensual sexual relationship."   "Is that a true statement in the police report?"  "It could be."   The jury obviously believed enough of what A.A. testified to, despite her contradictions, to provide an evidentiary basis for the conviction.   The jury necessarily disbelieved Pair and his alibi witnesses and necessarily believed much of A.A.'s testimony.

Somebody obviously was lying.  It was up to the jury to find who.
The magistrate judge was entirely correct in treating the case as
a test of credibility.  How much effect the demeanor of the various
witnesses had on the outcome is something that cannot be determined
from a cold transcript.  A.A. must have been a very compelling
witness despite her failure to get her story straight.

From its reading the transcript, this court finds that Conwill
did a more than adequate job of getting before the jury the
following evidence upon which a persuasive closing argument for an
acquittal could be, and presumptively was, made:

1.   A.A. was a 34-year old classic victim of unrequited love.
She had been rejected and humiliated.  She couldn't remember
whether Pair had told her not to call him.  She was obviously
distraught and was visibly confused.  On August 14, 2003, after
being told not to call Pair again, she became really angry.  No
psychiatrist was needed to support an argument that her injury was
self-inflicted as a bloody means of getting even.

2.   A.A.'s testimony that Pair, despite a number of prior
sexual encounters, had never ejaculated, goes medically
unexplained, and to the average juror would be incredible, unless
explained by Pair's desire for sadistic pleasure.  Sadism was, of
course, a possibility on August 14, 2003, although Pair had never
been brutal during earlier sexual encounters.  Every one of the
jurors, assuming that they had experienced sex, knew that orgasm is

the ordinary object of sexual activity.  Of course, the absence of semen in the material collected by A.A. during her medical exam might logically explain not only the absence of crucial DNA evidence (the best evidence now routinely scientifically available), but also A.A.'s resistance to a complete physical examination, during which she complained of such excruciating pain that she couldn't cooperate.  She had a clear memory that Pair did not ejaculate on August 14, 2003, **or ever before**, although she admittedly never mentioned the anomaly to Pair.

3.   A.A.'s unusual anal injury appeared to the examining nurse to have been caused by "blunt force".  If Pair had penetrated A.A.'s anus with a Coke bottle, or with a hammer, A.A. would surely have remembered the instrument he used.  An erect penis arguably does not qualify as a "blunt instrument".  A.A.'s particular injury was consistent with, and was severe enough to have been caused by, a broom handle jammed by A.A. into her own rectum while in a wild, highly emotional and irrational state.

4.   Would the usual sodomy victim wash her panties without getting all of the blood out of them, put them back on, and then call the brutal sodomizer on the phone?  Would she then ask him, "Why did you hurt me?", when she had emphatically testified that while he was sodomizing her he had told her exactly why he was hurting her, namely, because **"he didn't like her body"**, and because

76

"**she had hurt him**".  Did she need Pair to confirm on the phone what he had already told her in the midst of the attack?

5.   Pair's alibi witnesses, at least on paper, were just as solid as Conwill described them in his testimony before the magistrate judge.  Obviously, the jury didn't believe them, but was that Conwill's fault?

6.   In order for A.A.'s version of events to be believed, Pair drove from where he received her telephone call on August 14, 2003, to A.A.'s new abode during that telephone conversation, a conversation that, as A.A. described it, was not prolonged.  Either the two talked interminably while Pair was driving to A.A.'s residence, or Pair was in his vehicle very near A.A.'s residence when she called him late at night.  A.A.'s timing of events is questionable.

7.   Stranger than fiction is A.A.'s testimony that after the attack she called, not the police, but both a female friend and the attacker himself who had left her bleeding on the floor.  A.A. admitted that in April before the fateful August event, she had been distraught over her father's death.  The trial judge did not let Conwill proceed with any exploration of A.A.'s mental health. It is certainly not beyond belief that after A.A. called Pair and said to him, "Why did you hurt me?" Pair, as he testified, called the police and said something like they were about to get a call from a crazy woman.

77

The jury obviously forgave A.A. a lot.  The jury could have concluded that the state had provided proof beyond a reasonable doubt of the essentials for sodomy by reasoning that what started as consensual vaginal sex ended with non-consensual anal penetration.  Under Alabama law, this would have been enough for a conviction.  See Ala. Code § 13A-6-63(a)(1).  Where sex crosses the line into uninvited and resisted assault is not easy to determine. It is also possible from this evidence that the jury found that during consensual sex, Pair, as A.A. testified, disparaged A.A.'s body, causing her to become unglued and to decide to pay Pair back "big time" for what he had said to her.

### Did Conwill Make Any Unforgivable Mistakes?

Under these procedural circumstances, it is not the responsibility of this court to second guess the trial jury, or the trial court, or the state appellate courts.  Without shame, the undersigned admits that during his thirty years as a trial lawyer before becoming a judge 28 years ago, he lost some cases he should have won, and won some cases he should have lost.  In some of the cases he lost, whether at trial or on appeal, he has second-guessed himself many times, and wished he had done something different. The Sixth Amendment guarantees both the "assistance of counsel", and "an impartial jury".  The two provisions are equally important. Neither requires perfection.  Juries are not perfect, and lawyers are not perfect.  The jury that convicted Pair may have not been

"impartial" in the sense that it found A.A. a more compelling witness than it found Pair and his alibi witnesses.   In closing arguments, the prosecutor may have been more eloquent and persuasive than Conwill.   It is impossible to judge the total performance of the lawyers, because the closing arguments are not in the record.   And, if they were, they could commensurate the logic, but not the flourish and the fervor with which the arguments were presented.   If Conwill, as the magistrate judge believes he should have been, had been armed with Gaut as a witness, both closing arguments would have been different, but not necessarily any more persuasive.   In fact, this court believes the prosecutor, in her own strategy decision, might have been better off not to object to Gaut.

## Conclusion

The above-outlined arguments, and others, were available to Conwill, even without the evidence that the magistrate judge found absent and crucial.   If the jury had acquitted Pair, the acquittal would not have been surprising.   Nevertheless, the jury did, in fact, convict Pair after hearing substantial evidence that, if believed, met the state's burden.   If the jury was wrong, and it arguably was, its alleged miscarriage of justice cannot be laid at the feet of Conwill, particularly when Conwill enjoys the *Strickland* presumption of having exercised reasonable professional judgment.

The latest expression by the Eleventh Circuit on what constitutes "ineffective assistance" came as recently as July 23, 2009.  In *Philmore v. McNeil*, 575 F.3d 1251, 1264-65 (11th Cir. 2009), the Eleventh Circuit said:

> Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under *Strickland*.  *See Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir.1991).   In assessing an appellate attorney's performance, we are mindful that "the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue."  *Id.* at 1130-31.  Rather, **an effective attorney will weed out weaker arguments, even though they may have merit.**  *See id*, at 1131.  **In order to establish prejudice, we must first review the merits of the omitted claim.**  *See id*, at 1132.  **Counsel's performance will be deemed prejudicial if we find that "the neglected claim would have a reasonable probability of success on appeal."**

(**emphasis added**).

Conwill's strategy choices with which the magistrate judge found fault, and that allegedly prejudiced the outcome, were, in this court's opinion, reasonable professional choices, and if one or both of Conwill's choices had been different, they would, in this court's opinion, not have provided a reasonable probability of a "not guilty" verdict.  *Strickland* requires as a *sine qua non* for finding "ineffective assistance" both of these elements.

*Smith v. Spisak* (case below, *Spisak v. Hudson*, 512 F. 3d 582 (6th Cir. 2008)) is a death penalty case now before the Supreme Court of the United States.  The Supreme Court will hear oral argument in *Spisak* on October 13, 2009.  *Spisak* is a federal *habeas* case in which one of the issues is the amount of deference, if any,

to be accorded a state appellate courts' reasonable rejection of a petitioner's claim of "ineffective assistance".  In the instant case, Pair has exhausted his state remedies.  This says that some, if not all, of the same arguments Pair makes here were made to the state appellate courts.  From what this court has said above, this court finds that the appellate courts who reviewed Pair's conviction, and upheld it, made *Strickland* rulings that were not only "reasonable", but were *de novo* correct.  Thus, there is no reason for this court to wait for the Supreme Court to explain in *Spisak* what the proper degree of deference is to be accorded to reasonable appellate rulings.  The deference that must be given Conwill is enough.

Finding that respondents' objections to the magistrate judge's report and recommendation are well taken, the court will by separate order deny Pair's petition.

DONE this 30th day of September, 2009.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE